Marc S. Dreier (MD 9713)
Jeffrey A. Mitchell (JM 5323)
DREIER LLP
499 Park Avenue
New York, New York 10022
Tel.: (212) 328-6100
Fax: (212) 328-6101

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x

|  |  |  |
|---|---|---|
| XERION PARTNERS I LLC, XERION PARTNERS II MASTER FUND LIMITED, COHANZICK CREDIT OPPORTUNITIES MASTER FUND LTD., DALTON INVESTMENTS, LLC, and SOF INVESTMENTS, L.P. | : : : : : : : | Civil Action No. 06 CV 2434 (DC) |
|  | : |  |
| Plaintiffs, | : : | **AMENDED COMPLAINT** |
|  | : |  |
| v. | : : |  |
|  | : |  |
| RESURGENCE ASSET MANAGEMENT, LLC, JAY CAROTHERS, MARK SCOTT, COLEEN COLREAVY, ROBERT WEBBER, BYRON HANEY, and DELOITTE & TOUCHE USA LLP, | : : : : : | |
|  | : |  |
| Defendants. | : : |  |

-------------------------------------------------------------- x

Plaintiffs Xerion Partners I LLC ("Xerion I"), Xerion Partners II Master

Fund Limited ("Xerion II") (collectively referred to herein as "Xerion"), Cohanzick

Credit Opportunities Master Fund Ltd. ("Cohanzick"), Dalton Investments, LLC

("Dalton") and SOF Investments, L.P. ("SOF") (these parties will collectively be referred

to as "Plaintiffs"), by their attorneys Dreier LLP and Arnold & Itkin LLP, for their Amended Complaint against defendants Resurgence Asset Management, LLC ("Resurgence"), Jay Carothers ("Carothers"), Mark Scott ("Scott"), Coleen Colreavy ("Colreavy"), Robert Webber ("Webber"), Byron Haney ("Haney") (collectively, the "Individual Defendants"), and Deloitte & Touche USA LLP ("Deloitte") (collectively referred to herein as "Defendants"), allege as follows:

## **Nature of the Action**

1.      This is an action for fraud and misrepresentation arising out of a $130 million private placement of debt securities (the "Bonds") in November 2004 for the refinancing of furniture retailer Levitz Home Furnishings, Inc. ("LHFI") (the "Debt Offering").

2.      Plaintiffs purchased in the aggregate a total of $29.4 million of the Bonds in reliance upon Defendants' misrepresentations about the financial condition, asset value, goodwill, and business strategy and execution of LHFI.

3.      Shortly after the Debt Offering closed, LHFI's Chairman and Chief Executive Officer announced that he was leaving LHFI, and LHFI announced that it was drastically changing its business plan.  Less than one month later, and even before it was to have paid the bond holders the first coupon on the bonds, LHFI announced that it was insolvent and faced a $40 million shortfall.

4.      On or about October 11, 2005, less than one year after the Debt Offering closed, LHFI filed for protection under Chapter 11 of the United States Bankruptcy Code, whereupon the value of Plaintiffs' investment in LHFI became nearly worthless.

5.      Defendants' conduct complained of herein violated the Securities Exchange Act of 1934, 15 U.S.C. §78, *et seq.* (the "Exchange Act" or the "1934 Act") as well as the common law, and Plaintiffs sue here to recover the monetary damages they have sustained as a result.

## Jurisdiction and Venue

6.      Jurisdiction is conferred by Section 27 of the 1934 Act (15 U.S.C. §78aa) and 28 U.S.C. §1331. The claims asserted herein arise under Section 10(b) of the 1934 Act (15 U.S.C. §78j(b)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5), and under the common law.

7.      Venue is proper in this District pursuant to Section 27 of the 1934 Act (15 U.S.C. §78aa) and 28 U.S.C. §1391.

8.      In connection with the acts and conduct complained of herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails and the facilities of the national securities exchanges.

## The Parties

9.      Plaintiff Xerion I is a Delaware limited liability company, and Plaintiff Xerion II is a Bermuda partnership. The Xerion plaintiffs are investment funds managed by Xerion Capital Partners LLC, which is headquartered in New York City and invests, *inter alia*, in debt and equity based on fundamental merit.

10.      Plaintiff Cohanzick is a Cayman Islands corporation managed by Cohanzick Offshore Advisors, LP, a Delaware limited partnership.

11.     Plaintiff Dalton is a California limited liability company.

12.     Plaintiff SOF is a Delaware limited partnership.

13.     Defendant Resurgence is a wholly owned subsidiary of MD Sass Investors Services, Inc. and invests in distressed debt and equity.  Resurgence also manages hedge funds and funds of funds, participates in the raising of private equity and purchases equities, fixed income, real estate, tax liens, and other investment products.  At the time of the Debt Offering, Resurgence owned 84% of the common stock of LHFI, 100% of the Series B preferred shares, 100% of the Series C preferred shares, and 100% of the Series D preferred shares.

14.     Defendant Carothers was the Chairman and Chief Executive Officer of LHFI at all relevant times and resigned shortly after the Debt Offering closed.

15.     Defendant Scott was the Chief Operating Officer of LHFI at all relevant times.

16.     Defendant Colreavy is the Chief Financial Officer of LHFI.  Prior to becoming the CFO, Colreavy was LHFI's Senior Vice President-Finance.

17.     Defendant Webber was Senior Vice President-General Counsel of LHFI at all relevant times.

18.     Defendant Haney was a Director of LHFI, a member of LHFI's Audit Committee and a Managing Director of the Resurgence Management Companies at all relevant times.

19.     Defendant Deloitte is part of Deloitte Touche Tohmatsu, an organization of member firms worldwide that provide professional services and advice in four professional areas—audit, tax, consulting, and financial advisory services.  Deloitte

was LHFI's accounting firm at all relevant times. The Individual Defendants would not have been able to conceal and misrepresent LHFI's true adverse conditions without Deloitte's involvement.  Deloitte's unqualified or "clean" audit opinion was included in and incorporated in the PPM.

### Facts

#### Resurgence's Investment in Levitz

20.    Resurgence began acquiring an interest in the Levitz furniture chain in 1992.

21.    Between 1992 and 2000, Resurgence invested between $85 million and $125 million in LHFI, and another $35 million between 2001 and November 2004.

22.    By 2004, Resurgence had acquired a controlling interest approaching $160 million.

#### Levitz's Financial Difficulties

23.    In 1996, Levitz reported losses of $22 million, and in 1997, losses of an additional $26 million.

24.    As a result, in September 1997, Levitz was forced to file for protection under Chapter 11 of the Bankruptcy Code.

25.    Despite that bankruptcy filing, Levitz continued to hemorrhage money, and Resurgence was forced to provide an additional $35 million in post-petition financing.

26.    Despite more than two years of trying to rehabilitate Levitz, and the infusion of more than $235 million from the sales of stores and excess inventory

while the bankruptcy case was pending, Levitz incurred *post-petition* liabilities as of February 2000 of more than $230 million, and had no positive cash flow.

27.     On information and belief, Resurgence's investment in Levitz was so significant that had Levitz actually failed, Resurgence would have been required to report an enormous financial loss to its investors.

**Resurgence Turns to Seaman's to Salvage Levitz**

28.     Shortly after Levitz filed for bankruptcy protection, in December 1997, Resurgence bought a large stake in Seaman's, the principal competitor of Levitz. After that acquisition, Resurgence owned 38% of Seaman's common stock, and two other hedge funds, T. Rowe Price Recovery Fund ("T. Rowe Price"), and Carl Marks Management Co. ("CMM"), owned 42%.  Management held the remainder.

29.     Then, in a transparent effort to shore up its separate Levitz investment, almost immediately after its Seaman's acquisition, Resurgence proposed to the Seaman's board that the company merge with Levitz.

30.     The Seaman's board rejected that proposal as not in the best interests of Seaman's, not only because Levitz was its principal competitor, but more importantly, Seaman's was profitable and Levitz was not.

31.     Showing a greater concern for its own interests over those of the other Seaman's shareholders, Resurgence caused several independent directors to be replaced by others beholden to Resurgence, and bought enough shares from management to reach majority ownership of common stock.

32.     Thereafter, Seaman's and Levitz signed a deal in April 2000 that would combine their operations.

33.    T. Rowe Price and CMM, the other shareholders, brought suit in Delaware Chancery Court directly, and derivatively on behalf of Seaman's, seeking to enjoin that transaction as not in the best interests of Seaman's.

34.    In a decision dated June 23, 2000, the Court agreed, and granted a preliminary injunction, finding that "there is a substantial likelihood that defendants will be unable to satisfy any aspect of the fairness analysis and that, taken as a whole, the Agreements are likely to judged unfair to Seaman."

35.    The Court also came to the "obvious and troubling conclusion that [the Agreements] are designed and structured to restore the competitive position and power of Levitz in order to salvage Resurgence's investment in that company."

36.    Approximately two weeks later, the parties entered into a settlement agreement, the terms of which are confidential.

37.    Thereafter, LHFI was formed as a holding company to operate both Levitz and Seaman's.

**Levitz Continues to Have Difficulties**

38.    On information and belief, after the merger, unbeknownst to the public and Plaintiffs, LHFI operated both the Seaman's and Levitz brands, and used the assets of what was formerly Seaman's for its own benefit to shore up the finances of what had been Levitz.

39.    However, that strategy ultimately failed when sales of both brands were not enough to keep up with expenses.

40.     By 2004, LHFI was again in need of a cash infusion to pay down debt and continue operations, but could not raise the funds needed solely by an internal restructuring.

41.     Unwilling to put significantly more of its own money into the company, and, pursuant to the "Use of Proceeds" section of the PPM, looking to have most of the existing senior and junior debt repaid (including, presumably, some of its own), Resurgence decided to seek third party financing from the capital markets in a private placement to keep LHFI viable long enough for it to devise an exit strategy for itself.

**The Private Placement Memorandum**

42.     The November 9, 2004 private placement of the Debt Offering consisted of the following:  (a) $100 million of 12% Senior Secured Class A Notes due 2011 and (b) $30 million of 15% Senior Secured Class B Notes due 2011, together with 30,000 warrants to purchase common stock.

43.     The Debt Offering was solicited through a Private Placement Memorandum dated October 29, 2004 (the "PPM").

44.     As CEO, COO, and CFO, defendants Carothers, Scott, and Colreavy were responsible for ensuring that the PPM complied fully with the requirements of the federal securities laws and were not materially false or misleading. The Individual Defendants prepared, and were responsible for the contents of, all factual statements and representations made in the PPM.

45.     The PPM, a copy of which is annexed hereto as Exhibit A, was prepared under the direction and with the approval of Resurgence and the Individual Defendants, and with the assistance of Deloitte.

46.     The PPM outlined the proposed Debt Offering, described LHFI and its existing and projected business, purported to show how the proceeds of the Debt Offering were to be used, and included purportedly audited financial statements, which contained a balance sheet, cash flows and other similar financial information.

47.     The Debt Offering was not registered, and the PPM was intended for and provided only to accredited investors.

48.     Attached to the PPM were financial statements of LHFI, purportedly audited by Deloitte.   In the PPM (at page F-2), Deloitte provided the following certification of the LHFI financial statements:

> We have audited the accompanying consolidated balance sheets of Levitz Home Furnishings, Inc. and Subsidiaries (collectively, the "Company") as of March 31, 2004 and 2003, and the related consolidated statements of operations, stockholders' equity, and cash flows for each of the three years in the period ended March 31, 2004. . . .  Our responsibility is to express an opinion on these consolidated financial statements based on our audits.
>
> We conducted our audits in accordance with auditing standards generally accepted in the United States of America.   Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement.   An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements.   An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall consolidated financial statement presentation.   We believe that our audits provide a reasonable basis for our opinion.
>
> *In our opinion, such consolidated financial statements present fairly, in all material respects, the consolidated financial position*

*of the Company at March 31, 2004 and 2003, and the consolidated*
*results of their operations and their cash flows for each of the*
*three years in the period ended March 31, 2004, in conformity with*
*accounting principles generally accepted in the United States of*
*America.* (emphasis added)

49.     Unbeknownst   to   Plaintiffs,   the   PPM   included   material
misrepresentations about the financial condition and business prospects for LHFI.   In
particular, the PPM grossly overstated the value of LHFI's leasehold interests, presented
a materially false picture of LHFI's financial health, and significantly misrepresented its
proposed business plan after closing.   The PPM failed to disclose, in particular, that the
Chairman and CEO of LHFI was planning to leave shortly before the end of the
following quarter.   The PPM also misrepresented the relationship between LHFI and its
vendors, its sales history, and the financial viability of its stores, all for the purpose of
enabling Resurgence to keep its Levitz investment alive.

**Defendants' Specific Misrepresentations and Omissions**

**A.     The Disappearing Leasehold Interests and Goodwill**

50.     The PPM (at page F-3) represented that the value of LHFI's net
leasehold interests was approximately $73 million as of June 2004.

51.     In order to protect that purported leasehold equity, the PPM and an
indenture that accompanied it provided Plaintiffs and the other investors with a negative
covenant that assured that those leasehold interests would not be encumbered to the
bondholders' detriment.

52.     This negative covenant was a material part of the Debt Offering
and was an inducement to Plaintiffs because it acted as security against future legitimate
problems.   In fact, Defendants Scott, Carothers, and Colreavy claimed that leasehold

value was $73 million according to a recently performed valuation. This misrepresentation was made at an October 2004 Road Shows presentation to Plaintiffs.

53.     The represented value of the leasehold interests, which was supposedly audited by Deloitte, was material to the investments that underlie this action, and Plaintiffs relied on the presumed accuracy of that representation.

54.     The value of LHFI's leasehold interests was in fact materially misrepresented and overstated in the PPM.

55.     Following the November 9, 2004 closing, LHFI, with no explanation whatsoever, reduced the stated value of its leasehold interests to $48 million as of March 31, 2005.

56.     Upon information and belief, the actual value of the LHFI leasehold interests was substantially less than even that restated value at the time the PPM was issued.

57.     LHFI's restatement of the value of its leasehold interests came amid an extraordinary rise in real estate and leasehold values generally and was wholly inconsistent with what an investor would ordinarily expect during that time period.

58.     Plaintiffs later learned that value of the leasehold interests reported in the PPM was actually a figure calculated in 2001.

59.     As part of their responsibilities at LHFI, each of the Individual Defendants received adverse, non-public, and specific information about the Company's true financial results and performance—including the value of the leaseholds. The Individual Defendants knew or should have known as of October 2004 that the valuation

of the leaseholds as represented in the Road Shows and the PPM was not a current figure
and was materially false.

60.     With knowledge of LHFI's true value of the leaseholds, or in
reckless disregard thereof, the Individual Defendants caused to be issued the materially
false and misleading representations about the valuations of the leaseholds. As a result of
the Individual Defendants' knowing or reckless misconduct and participation in the
fraudulent scheme, the Individual Defendants are jointly and severally liable to Plaintiffs.

61.     Furthermore, in the audited financial statements attached to the
PPM, LHFI misrepresented that it had goodwill in the amount of $90,466,000 as of the
quarters ended March 31, 2002 and 2003, and June 30, 2004.

62.     When LHFI released its financial results for the fiscal year ended
March 31, 2005, just four months after closing, it reported that its goodwill had no value,
which was what a truthful valuation in the PPM would have shown.

63.     Deloitte, as LHFI's auditor, acted recklessly in failing to conduct a
prior audit of LHFI's financial statements and instead, simply accepted valuations
provided by the Individual Defendants and was therefore responsible for the foregoing
misrepresentations.

64.     With knowledge of LHFI's true financial condition, including the
overstatement of goodwill and the value of the leaseholds, or in reckless disregard
thereof, Deloitte certified that the false and misleading financial statements of LHFI for
the fiscal years 2003 and 2004 had been conducted in accordance with GAAS and
provided an unqualified Independent Auditors' Report on those financial statements,
which falsely certified that the financial statements fairly presented LHFI's financial

condition and results of operations in conformity with GAAP, and which was included in the PPM.  Without this false unqualified audit opinion and report, Defendants' scheme could not have been perpetrated.

65.     Deloitte consented to the incorporation by reference of the false and misleading certified financial statements into the PPM used in connection with the Debt Offering.   Deloitte directly participated in and worked with the Individual Defendants—Carothers, Scott, Colreavy, Webber, and Haney—to develop the accounting practices and disclosures utilized in the audited financial statements that were included in the PPM.

66.     Issuance of this false opinion and report violated Deloitte's legal obligations to Plaintiffs.   The opinion and report contained materially false and misleading statements in violation of the federal securities laws.  As a result of Deloitte's knowing or reckless misconduct and participation in Defendants' fraudulent scheme, Deloitte is jointly and severally liable to Plaintiffs.

### B.     Defendants' Misrepresentation of LHFI's Strengths and Strategy

67.     The PPM also represented that LHFI had the following inherent strengths, all of which Plaintiffs materially relied upon in purchasing the Bonds:

   a.   Store density,

   b.   Strong brand name recognition,

   c.   Strong and diversified vendor relationships,

   d.   Superior customer service, and

   e.   A highly experienced management team.

68.   These representations were materially false when made, and Defendants knew or should have known them to be false when they were made.

69.   Unbeknownst to Plaintiffs, at the time of the Debt Offering, not only were LHFI's vendor relationships not strong, as represented, but LHFI was actually on the verge of losing three of its top vendors due to delayed payments by LHFI. This made it impossible for LHFI to fill orders and resulted in substantial backorders and cancellations.  None of this was disclosed to investors, even though it was known to the Individual Defendants at the time of the Debt Offering.

70.   In fact, Defendants Carothers, Scott, and Colreavy received performance reports showing that the sales and earnings were declining, problems with vendors were rampant, and that the cost cutting measures that were touted in the Road Shows and PPM were not succeeding.  Despite these reports, the Individual Defendants made the above-misstatements in the PPM and statements at the Road Shows that LHFI's vendor relationships were strong and that cost-cutting would increase LHFI's financial performance and efficiency.

71.   The Individual Defendants further represented that, after the refinancing of debt, LHFI's going forward strategy would be to further increase store density, reduce costs, increase comparable store sales, increase margins through directly imported furniture and increase sales through its website—Furniture.com.  Plaintiffs materially relied on these representations as well.

72.   These representations were materially false when made and Defendants knew or recklessly disregarded facts that would have led them to know that LHFI's Chairman and Chief Executive Officer was planning to leave the Company after

the Debt Offering and that LHFI planned to drastically change its business plan. The Individual Defendants withheld this information so that they could accomplish their goal of prolonging LHFI's existence so Resurgence could have time to devise an exit strategy for it investment by fraudulently inducing Plaintiffs to acquire the overvalued Bonds.

73.     True to their plan, on March 11, 2005, just several months after closing, Carothers resigned as the Chairman of the Board and Chief Executive Officer of LHFI, after which LHFI announced a business strategy that was radically different from what was outlined in the PPM. LHFI stated on or about April 8, 2005, that it had decided to shut the entire Seaman's chain and close those stores, half of which it would reopen as Levitz stores. This was in fact what had been planned all along, but not disclosed in the PPM.

74.     Based on the foregoing, Deloitte knowingly and/or recklessly failed to issue a "going concern" warning when it audited the financials contained in the PPM despite knowledge of material adverse facts about the financial and business condition of LHFI that made the survival of LHFI as a going concern highly unlikely, if not impossible.

## C.     The Fraudulent "Road Shows" and Falsely Stated Earnings

75.     In furtherance of the Debt Offering, LHFI, at the direction of and with the assistance of the Individual Defendants, including Carothers, Scott, and Colreavy, and non-party Robert Symington (who was a director of LHFI and a Managing Director of Resurgence at all relevant times) conducted a series of "road show" meetings in New York during October of 2004, to highlight the representations in the PPM and to tout the purported financial strength of LHFI.

76.     During the Road Shows, LHFI represented that its earnings before interest, taxes, depreciation, and amortization ("EBITDA") for the trailing 12 months to be $32 million as of June 30, 2004, on an audited basis, and $36 million as of September 30, 2004, on an unaudited basis.

77.     The Individual Defendants, with the aid of Deloitte, reported these false and misleading financial results by accruing unauthorized, improper, and unsustainable deductions from the amounts owned to vendors, by failing to recognize impairment losses, by manipulating "same store" sales figures, by improperly failing to recognize inventory losses, and by other manipulations. As a result, LHFI's costs were understated and its earnings were overstated.

78.     On information and belief, Carothers and Colreavy with the knowledge and/or reckless disregard of the true facts by the other Individual Defendants and Deloitte, used a variety of techniques to inflate earnings in violation of accepted accounting practices.     Specifically, they accrued unauthorized, improper, and unsustainable deductions from accounts payable due to vendors, inflated earnings in violation of accepted accounting practices, and manipulated "same store" sales figures which are used by analysts and investors to judge the improvement or deterioration of a retail business from year to year.

79.     These manipulations were known to or recklessly disregarded by Carothers, the corporate CEO, and Colreavy, the corporate CFO. These manipulations resulted in the presentation of a materially false and misleading picture of LFHI's business to Plaintiffs.

80.     The Individual Defendants used their influence and control to further the scheme alleged herein.  They had broad responsibilities which included communicating with Plaintiffs and providing Plaintiffs with financial results.  They were privy to and directed the making of financial projections and results.  They received regular reports showing that LHFI's publicly-announced pro forma EBITDA numbers were inflated.  By making the misleading statements contained herein, they knew that they would artificially inflate the value of the Company's securities.  Their actions in doing so resulted in damage to Plaintiffs.

81.     LHFI reported in the PPM a net loss for first quarter 2004 (three months ended June 30, 2004) of approximately $11 million. (Ex. A. at F-4). After the closing, it reported a net loss for the second quarter (three months ending September 30, 2004) of more than $10 million.  LHFI next reported a net loss of approximately $28 million for the third quarter ended December 31, 2004, putting its net loss for the year-to-date at $49 million.  Finally, in its year-end statement for the year ending March 31, 2005, LHFI reported a total net loss for the year of *$212 million*!

82.     This means that during the quarter of the Debt Offering, losses almost tripled, and for the next full quarter succeeding closing were more than $162 million for that quarter alone, more than 15 times higher than the quarterly loss reported in the PPM.  There was no warning of this ongoing implosion in the PPM despite current hemorrhagic losses and the transaction being touted as the final phase of a turnaround.

83.     The Individual Defendants, including Carothers, Scott, and Colreavy, and non-party Symington also represented during the Road Shows that LHFI had strong relationships with its vendors.  However, that statement too was materially

false when made, and Defendants—based on their positions in the Company and the responsibilities commensurate therewith—knew or recklessly disregarded facts that would have led them to know so.

84.    At the time of the Debt Offering, LHFI was dependent on a limited number of vendors and had poor relationships with all of them. LHFI's furniture orders were inconsistent, and, as a result, it was unable to obtain preferential pricing and actually paid more for furniture than its competitors.

85.    Moreover, because of its spotty inventory, LHFI would make sales and then be unable to deliver, driving away customers and further decreasing its sales. The Defendants knowingly failed to disclose in the PPM that LHFI lacked any effective inventory management program and was forced to shut down 20 stores within a nine month period as a result of lost sales.

86.    Indeed, with the intent of deceiving Plaintiffs and other prospective investors, Defendants knowingly failed to disclose that many other of LHFI's stores were on the verge of closing before the Debt Offering closed, and that, in fact, at least 20 of its stores had negative cash flows during the preceding year.

87.    Defendants also knowingly failed to disclose that they lacked the expertise and experience to operate LHFI's stores. Specifically, they failed to disclose that LHFI lacked a modern accounting system and, as a result, lacked the ability to prepare accurate monthly profit and loss statements.

88.    The Individual Defendants would not have been able to conceal and misrepresent LHFI's true adverse conditions without the involvement of LHFI's auditor, Deloitte. Deloitte's unqualified or "clean" audit opinion in the PPM was key to

facilitating the Debt Offering, which propped up LHFI and Resurgence's investment in it—at the expense of Plaintiffs.

**Deloitte's Knowing Participation in the Scheme**

89.     Deloitte was LHFI's auditor during the relevant time period. Deloitte counseled LHFI on a wide variety of tax accounting and other business matters, and attended meetings of the Audit Committee of the Company's Board of Directors to discuss the planning and the staffing for its audit, and the Company's internal controls. As a result of the services rendered to LHFI, Deloitte personnel had access to and knowledge of LHFI's private and confidential corporate, financial, and business information through conversations with LHFI's employees and reviewing documents not publicly available. Accordingly, Deloitte was thoroughly familiar with all aspects of the Company's financial history, accounting practices, internal controls, and business operations.

90.     Deloitte had direct knowledge of and consulted with the Individual Defendants about some of the manipulations described herein and Deloitte either knew about, or recklessly disregarded, them.

91.     Deloitte audited and certified LHFI's financial statements as of and for the fiscal years ending in March 2003 and 2004. Deloitte represented in the PPM that LHFI's financial statements fairly presented LHFI's financial condition and results of operation in conformity with GAAP and that the financial statements had been audited by Deloitte in accordance with GAAS. To the contrary, Deloitte's report was false and misleading, as LHFI's financial statements were not prepared in conformity with GAAP, and Deloitte's audit was not prepared in compliance with GAAS.

92.     Had these financial statements been prepared in accordance with GAAP, LHFI's net income and total assets (among other financial statement items) would have been substantially and materially reduced.

**Deloitte Failed to Follow GAAS and GAAP**

93.     Deloitte knew that it was required to adhere to the standards and principles of GAAS, including the requirement that the financial statements comply in all material respects with GAAP. Deloitte, in issuing its unqualified opinion, knew that by doing so it was engaging in a gross departure from GAAS, or issued such certification with reckless disregard for whether or not GAAS was being complied with.

94.     Deloitte's unqualified opinion, insofar as it stated that Deloitte's audit of the Company's financial statements were conducted in accordance with GAAS, was false and misleading because the following GAAS (AU § 150) were knowingly or recklessly violated:

- General Standard No. 3 was violated, which standard requires that due professional care is to be exercised in the performance of the audit and in the preparation of the report

- Standard Of Field Work No. 3 was violated, which standard requires that sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under examination; and

- Standard Of Reporting No. 3 was violated, which standard requires that informative disclosures in the financial statements are to be

regarded as reasonably adequate unless otherwise stated in the report.

95.     LHFI was required to disclose in its financial statements the existence of the material facts described above and to appropriately report transactions in conformity with GAAP. LHFI failed to make such disclosures and to account for and to report transactions in the financial statements in conformity with GAAP. Deloitte was, therefore, required pursuant to GAAS, to express an adverse opinion (AU § 508) on LHFI's financial statements.

96.     Deloitte knew or recklessly disregarded the facts which indicated that the financial statements were false and misleading for the reasons set forth herein, and Deloitte violated GAAS in failing to express an adverse opinion on the financial statements.

97.     GAAS mandates that: "Due professional care is to be exercised in the planning and performance of the audit and the preparation of the report." Deloitte's responsibility, as LHFI's independent auditor, included determining "[s]ufficient competent evidential matter . . . to afford a reasonable basis for an opinion regarding the financial statements under audit" as to "the fairness with which they present, in all material respects, financial position, results of operations, and its cash flows in conformity with generally accepted accounting principles." AU §§ 110, 150.

98.     As particularized above and below, Deloitte failed to comply with GAAS in that, among other things, it failed to perform its audit of the financial statement with a proper degree of professional skepticism. In this regard, Deloitte either identified and ignored evidence that the Company's financial statements were materially misstated

by means of false and misleading accounting or recklessly failed to identify such false and misleading accounting.

99.     Had Deloitte undertaken the performance of those audit procedures which were required by GAAS, and with the due professional care which was required by GAAS, it would have known that the financial statements were materially false and misleading because these financial statements were not presented in accordance with GAAP.  In reckless disregard of professional standards, as particularized above and below, Deloitte failed to audit the financial statements in conformity with GAAS.

**Deloitte Failed to Disclose the Material Misstatements in the Financial Statements**

100.     During the performance of its audit, Deloitte learned and ignored or recklessly failed to learn that: (1) the leaseholds were overvalued; (2) LHFI's goodwill was overstated; (3) LHFI was having serious disputes with its vendors; (4) LHFI's sales and earnings were declining, (5) LHFI's cost-cutting measures were not improving the Company's financial health; (6) deductions from the amounts owned to vendors were being improperly accounted for, and (7) inventory losses were not being recognized.

101.     Deloitte also failed to identify a lack of internal controls at LHFI. During the relevant time period, Deloitte identified and ignored or recklessly failed to identify the existence of material weaknesses in LHFI's system of internal controls which enabled the Individual Defendants to materially overstate the value of goodwill and the leaseholds and understate accounts payable to vendors.

102.     Deloitte either knew and ignored all of the foregoing and permitted the material overstatement of the leasehold value and goodwill or recklessly conducted its

audit in a manner which constituted a gross departure from GAAS and, therefore, failed to identify the fact that the Company had materially misrepresented these issues.

103.    During the relevant time period, numerous irate vendors threatened to cease doing business with LHFI. Many of the vendors' issues with LHFI were reduced to writing and were readily available for inspection by Deloitte, had Deloitte taken the initiative to review vendor correspondence files. (AU § 330).

## Deloitte Knew or Recklessly Disregarded the Fact that LHFI's Assets Were Impaired.

104.    GAAP (FASB Statement No. 121, Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to Be Disposed Of) states that: "An entity shall review long-lived assets and certain identifiable intangibles to be held and used for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable."

105.    This GAAP also states that, when the recoverability should be assessed by estimating "the future cash flows expected to result from the use of the asset and its eventual disposition" and, "if the sum of the expected future cash flows (undiscounted and without interest charges) is less than the carrying amount of the asset, the entity shall recognize an impairment loss" in "the amount by which the carrying amount of the asset exceeds the fair value of the asset." It also mandates that, in assessing the recoverability:

> Estimates of expected future cash flows shall be the best estimate based on reasonable and supportable assumptions and projections. All available evidence should be considered in developing estimates of expected future cash flows. The weight given to the evidence should be commensurate with the extent to which the

> evidence can be verified objectively.  If a range is estimated for either the amount or timing of possible cash flows, the likelihood of possible outcomes shall be considered in determining the best estimate of future cash flows. (emphasis added)

106.    The foregoing GAAP (FASB Statement No. 121) was superseded by a GAAP pronouncement (FASB Statement No. 144, Accounting for the Impairment or Disposal of Long-Lived Assets) which reaffirmed the requirement to recognize an impairment loss when the carrying amount of a long-lived asset is not recoverable from its undiscounted cash flows and to measure an impairment loss as the difference between the carrying amount and fair value of the asset.

107.    Defendants fraudulently avoided the recognition of approximately $73 million of impairment losses by evaluating the recoverability of the Company's leaseholds using estimates of expected future cash flows which, in contravention of the foregoing GAAP, were not based on objective, reasonable, and supportable assumptions and projections.

108.    Deloitte furnished an unqualified audit opinion on LHFI's financial statements stating that its audit "includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation."

109.    Deloitte either evaluated the reasonableness of the cash flow scenarios advanced by the Individual Defendants as justification for the non-recognition of the leasehold impairment losses, and knew and ignored the fact that the estimates were not based on objective, reasonable, and supportable assumptions and projections, or Deloitte was reckless in not knowing this fact.

110.    Specifically, with regard to each of the LHFI leaseholds, Deloitte was required to review the historical operating and cash flow data, and to assess the integrity of the assumptions which served as the basis for prospective cash flow estimates. Deloitte either performed these procedures and knew and ignored the fact that certain of the leaseholds were materially impaired or recklessly failed to know this fact and, therefore, failed to identify the fact that the carrying amount of these leaseholds exceeded their fair value by approximately $73 million.

111.    By failing to recognize the $73 million of impairment losses in the financial statements which were disseminated to Plaintiffs, LHFI's financial statements failed to comply with GAAP and said financial statements, were materially false and misleading.

**Plaintiffs' Fraudulently Induced Investment**

112.    Despite Defendants painting a grossly misleading and inflated picture of LHFI's finances and future prospects in the PPM and during the Road Shows, the actual condition of its balance sheet and future prospects were worse than bleak. Even with the refinancing, LHFI was on the verge of implosion.

113.    As a result of, and in reliance on Defendants' misrepresentations, SOF purchased $13.2 million of the Class A Bonds, Xerion I purchased $4.5 million of the Class A and $1 million of the Class B Bonds; Xerion II purchased $4.5 million of the Class A and $1 million of the Class B Bonds; Dalton purchased $700,000 of the Class A Bonds and $2 million of the Class B Bonds; and Cohanzick purchased $2.5 million of the Class A Bonds.

114.   Had Defendants not misrepresented the financial condition of LHFI, Plaintiffs would not have invested in the Debt Offering.

**LHFI'S Last Gasp and Bankruptcy**

115.   In April 2005, only five months after the Debt Offering and just days before the first coupon on the Bonds was scheduled to be paid by LHFI, Resurgence advised Plaintiffs and the other bondholders that LHFI was experiencing a liquidity crisis and needed an additional $40 million to stay solvent.  Resurgence advised that it was willing to fund only half of the liquidity shortfall.

116.   Pursuant to covenants in the Debt Offering, LHFI could not take on additional debt senior to the Series A Notes without approval of a majority of the bondholders.  Resurgence asked the bondholders to waive the covenants.  Plaintiffs and other bond holders requested a diligence period during which they would be provided with an explanation of how the business had deteriorated so rapidly in a matter of months. Defendants refused.

117.   As a result of the revelation of this information, the price of the Bonds declined from a high of $104 on January 21, 2005, to $82 on April 18, 2005.

118.   On September 29, 2005, senior executives of LHFI, including Scott, and LHFI's counsel appeared at Xerion's offices and made a desperate appeal for no less than $17 million of emergency liquidity, which they stated had to be received within days in order for LHFI to avoid a Chapter 11 filing and potential liquidation. They informed Xerion that Defendant Resurgence had "thrown in the towel."

119.   Plaintiffs declined to put more cash into LHFI.

120.   As a result of the revelation of the actual financial picture of LHFI, on the next day—September 30, 2005—the price of the Bonds radically dropped, from $75 to $52 (a decline of 31%).

121.   On October 11, 2005, LHFI filed for protection under Chapter 11 of the United States Bankruptcy Code.

**Plaintiffs' Mitigation of Damages**

122.   Effective as of January 30, 2006, a Delaware Limited Liability Corporation, PLVTZ, LLC ("PLVTZ"), proffered a tender offer to the holders of the Class A Bonds.

123.   Effectively, PLVTZ offered to purchase for cash all outstanding Class A Bonds for $50.00 per $1,000 principal face amount.

124.   PLVTZ also paid into a trust $1,000,000 as collateral for perfected security interests that the Debt Holders had as a result of their ownership of the Bonds, which equates to an additional $10.00 per $1,000 principal face amount of the Bonds.

125.   Accordingly, the total possible consideration available to the Bond holders was $60.00 per $1,000 principal face amount of the Bonds, less fees and expenses of the tender offer.

126.   Plaintiffs Xerion, Cohanzick, and SOF accepted the full tender offer, thereby mitigating some of their damages.

**Defendants' Deceitful Conduct**

127.   All of the Defendants knew or recklessly disregarded the contents of the PPM, as well as the actual truth of the matters misrepresented therein.

128.   Resurgence, by virtue of its substantial equity investment in LHFI and its past misconduct in connection with the operation of LHFI and its predecessor, Levitz, had the motive and opportunity to control what information LHFI included in the PPM, and was responsible for the misrepresentations and omissions therein.  By virtue of its course of conduct over more than twelve years investing in Levitz and LHFI, Resurgence knew that if it did not misrepresent LHFI's financial picture and business and bring in additional capital via the Debt Offering, LHFI would immediately cease to be a going concern and Resurgence would lose all or substantially all of its between $120 million and $160 million investment, so it opted to induce others to prop up its investment.

129.   As part of their responsibilities at LHFI, the Individual Defendants were intimately involved with the day-to-day operation of LHFI and knew that it was not a healthy company.  In fact, they knew that if they did not misrepresent LHFI's financial picture and business and bring in additional capital via the Debt Offering, LHFI would cease to be a going concern and they would lose their jobs and face substantially limited prospects in the future.  By contrast, if the Individual Defendants propped up LHFI's financial status they could maintain their positions and commensurate substantial salaries and bonuses.

130.   This was especially so for defendant Colreavy, who had been an employee of LHFI and its predecessor, Seaman's, since 1989 and had risen through the ranks, having held titles such as Controller, Budget Manager, Financial Reporting Manager, Senior Vice President-Finance, and finally Chief Financial Officer.

131.   As Senior Vice President-Finance and Chief Financial Officer, Colreavy had an intimate knowledge of the company's actual financial picture. She had access to all the financial reports of the company, including monthly, quarterly, and annual sales figures, and had direct responsibility for ensuring that accurate financial information was presented in the PPM.

132.   Defendant Carothers, as Chairman and CEO, also had direct knowledge of the financial picture at LHFI and, according to the PPM, had "direct oversight of the distribution, information systems, finance, store administration, legal[,] and human resources functions" of LHFI. (Ex. A at 59). As such, Carothers knew that if he did not misrepresent LHFI's financial picture and business, and bring in additional capital via the Debt Offering, LHFI would immediately cease to be a going concern. As further evidence that he knew the true picture at LHFI, Carothers resigned shortly after the Debt Offering closed.

133.   Defendant Webber was Senior Vice President-General Counsel of LHFI, and had been employed in a general counsel capacity at Seaman's since 1995, and as assistant general counsel since 1983. Accordingly, Webber had extensive knowledge about the legal requirements of what needed to be reported in the PPM. He had extensive experience with the company, and knew that the financial and business picture presented in the PPM was materially false. As General Counsel of LHFI, Webber had a responsibility to ensure that the PPM accurately portrayed LHFI, its business and prospects, which it clearly did not.

134.   Defendant Haney was a Certified Public Accountant and a member of LHFI's Audit Committee. As such, he had direct access to, and responsibility for the

accuracy of, LHFI's financial statements. He had been a Director of LHFI since February 2001, so he knew that LHFI's financial position and business were not as they were portrayed in the PPM. Moreover, Haney knew that the leasehold values were grossly overstated and, in fact, were based on a valuation from 2001 that was assembled before the majority of them were sold, yet he allowed the PPM to be released with those materially false valuations.

135.    Deloitte, in particular, misrepresented that it had conducted and completed an audit of the financial records of LHFI and that, in conducting that audit, it had properly and in accordance with ordinary and customary accounting practices and generally accepted auditing standards tested and audited the financial information reported in the PPM and the financial statements attached thereto. Instead, it had recklessly and willfully accepted financial representations of LHFI and Resurgence at face value without performing any audit of those figures thereby certifying a grossly false financial picture of the company.

136.    Deloitte was reckless in failing to audit the values of LHFI's leasehold interests and goodwill, which were materially overstated in the PPM.

137.    Defendants knew the contents of, and that the purpose of, the PPM and the financial statements contained therein was to induce Plaintiffs and other accredited investors to participate in the Debt Offering and that in order to do so Defendants would need to materially misrepresent the financial condition of LHFI and its business.

138.    Defendants' wrongful acts described herein were reckless, willful and/or grossly negligent and intended to fraudulently induce Plaintiffs and others to invest in the Debt Offering.

139.    The material information that Defendants failed to disclose to Plaintiffs was readily available to Defendants and gives rise to a strong inference that they knew or recklessly disregarded that their representations were false and misleading.

140.    But for Defendants' misrepresentations and omissions, Plaintiffs would not have purchased the Bonds.

141.    As a direct result of Defendants' misrepresentations, Plaintiffs have suffered a loss of $22.4 million net of what they recovered in mitigation.

## FIRST CLAIM FOR RELIEF

### - For Violation of §10(b) of the 1934 Act and Rule 10b-5 against All Defendants -

142.    Plaintiffs repeat and reallege the allegations contained in paragraphs "1" through "141" above as if set forth at length herein.

143.    Defendants disseminated or approved the false statements specified above, which they knew were misleading, or deliberately disregarded their misleading and false nature in that the statements contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

144.    Plaintiffs did not know, nor with the exercise of reasonable diligence could have known, the falsity of the representations set forth above.

145.     Plaintiffs reasonably relied on Defendants' misrepresentations and would not have purchased the Bonds but for Defendants' misrepresentations.

146.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

a.     Employed devices, schemes, and artifices to defraud;

b.     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c.     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs.

147.     As a direct result of Defendants' foregoing violations, Plaintiffs have suffered damages in an amount not less than $22.4 million to be determined at trial.

## SECOND CLAIM FOR RELIEF

### – For Fraud against All Defendants –

148.     Plaintiffs repeat and reallege the allegations contained in paragraphs "1" through "141" above as if set forth at length herein.

149.     Defendants circulated the PPM in order to induce Plaintiffs and others to take part in the Debt Offering.

150.     The PPM contained fraudulently inflated information regarding, *inter alia* the value of LHFI's leasehold interests, LHFI's financials and LHFI's strengths

and its business plan that Defendants knew was materially false. Defendants then misrepresented LHFI's earnings in the Road Shows preceding the closing.

151.  Plaintiffs justifiably relied on the fraudulent information disseminated by Defendants in determining to invest in the Debt Offering.

152.  As a direct result of Defendants' fraud, Plaintiffs have suffered damages in an amount not less than $ 22.4 million to be determined at trial.

## THIRD CLAIM FOR RELIEF

### - For Negligent Misrepresentation and Professional Negligence against Deloitte -

153.  Plaintiffs repeat and reallege the allegations contained in paragraphs "1" through "141" above as if set forth at length herein.

154.  Deloitte certified that the financial statements that it prepared for LHFI were true and accurate and in compliance with GAAS and GAAP.

155.  Plaintiffs reasonably relied on Deloitte's certification in investing in the Bonds.

156.  Deloitte knew and intended that its certification of LHFI's financial statements would be included in the PPM and would be relied upon by prospective investors in the Debt Offering, including Plaintiffs.

157.  The financial statements in the PPM contained material misrepresentations, and Deloitte's audit was not performed in compliance with GAAS and GAAP.

158.  Deloitte was negligent in its certification of the financial statements in the PPM.

159.   As a direct result of Deloitte's negligence and negligent misrepresentations, Plaintiffs have suffered damages in an amount not less than $22.4 million to be determined at trial.

### FOURTH CLAIM FOR RELIEF

#### - For Negligence against Individual Defendants -

160.   Plaintiffs repeat and reallege the allegations contained in paragraphs "1" through "141" above as if set forth at length herein.

161.   As Directors and Officers of LHFI, the Individual Defendants owed Plaintiffs a duty to confirm that the financial condition of LHFI was not misrepresented on the PPM or at the Road Shows.

162.   The Individual Defendants breached their foregoing duty to Plaintiffs by allowing the value of LHFI's leasehold interests, financials, and business implementation and strategy to be misrepresented.

163.   As a direct result of the Individual Defendants' negligence, Plaintiffs have suffered damages in an amount not less than $22.4 million to be determined at trial.

**WHEREFORE**, Plaintiffs hereby request that the Court enter judgment in their favor and against Defendants as follows:

A.   On the first claim for relief, judgment for SOF in the amount of $7 million, judgment for Xerion I in the amount of $5.23 million, judgment for Xerion II in the amount of $5.23 million, judgment for Dalton in the amount of $2.7 million, and judgment for

Cohanzick in the amount of $2.35 million, plus costs and attorneys' fees;

B.  On the second claim for relief, judgment for SOF in the amount of $7 million, judgment for Xerion I in the amount of $5.23 million, judgment for Xerion II in the amount of $5.23 million, judgment for Dalton in the amount of $2.7 million, and judgment for Cohanzick in the amount of $2.35 million, plus costs and attorneys' fees;

C.  On the third claim for relief, judgment for SOF in the amount of $7 million, judgment for Xerion I in the amount of $5.23 million, judgment for Xerion II in the amount of $5.23 million, judgment for Dalton in the amount of $2.7 million, and judgment for Cohanzick in the amount of $2.35 million, plus costs and attorneys' fees;

D.  On the fourth claim for relief, judgment for SOF in the amount of $7 million, judgment for Xerion I in the amount of $5.23 million, judgment for Xerion II in the amount of $5.23 million, judgment for Dalton in the amount of $2.7 million, and judgment for Cohanzick in the amount of $2.35 million, plus costs and attorneys' fees; and

E.  On all claims for relief, for punitive damages and such other further and different relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated:   New York, New York
         June 9, 2006

**DREIER LLP**

By: _____

Marc S. Dreier (MD 9713)
Jeffrey A. Mitchell (JM 5323)
499 Park Avenue
New York, New York 10022
(212) 328-6100
(212) 328-6101 – Fax
*Attorneys for Plaintiffs*
*Xerion Partners I LLC, Xerion Partners II*
*Master Fund Limited, Cohanzick Credit*
*Opportunities Master Fund Ltd., Dalton*
*Investments LLC, and SOF Investments, L.P.*

**ARNOLD & ITKIN LLP**
Kurt B. Arnold (Admitted *Pro Hac Vice*)
Jason A. Itkin (Admitted *Pro Hac Vice*)
700 Louisiana Street, Suite 4700
Houston, TX 77002
(713) 654-0063
(713) 658-0674 – Fax
*Attorneys for Dalton Investments LLC and SOF*
*Investments, L.P.*

TO:   Robert H. Baron, Esq. (RB 3765)
      Cravath, Swaine & Moore LLP
      825 Eighth Avenue
      New York, NY 10019
      (212) 474-1000
      Attorneys for Defendants Robert Webber,
      Colleen Colreavy, Jay Carothers, and Mark Scott

      Joseph S. Allerhand, Esq. (JA 3201)
      Weil, Gotshal & Manges LLP
      767 Fifth Avenue
      New York, NY 10153
      (212) 310-8000
      Attorneys for Defendants Resurgence
      Asset Management, LLC and
      Byron Haney

      Dennis P. Orr, Esq. (DO 6488)
      Mayer, Brown, Rowe & Maw LLP
      1675 Broadway
      New York, NY 10019
      (212) 506-2500
      Attorneys for Defendant Deloitte & Touche USA LLP