```
                                          ┌─────────────────────────────┐
                                          │ USDC SDNY                   │
UNITED STATES DISTRICT COURT              │ DOCUMENT                    │
SOUTHERN DISTRICT OF NEW YORK             │ ELECTRONICALLY FILED        │
- - - - - - - - - - - - - - - - - -x      │ DOC #: _____        │
                                          │ DATE FILED: Feb 22 2007     │
                                          └─────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

XERION PARTNERS I LLC, XERION          :
PARTNERS II MASTER FUND LIMITED,
COHANZICK CREDIT OPPORTUNITIES         :
MASTER FUND LTD., DALTON
DALTON INVESTMENTS, LLC, and           :
SOF INVESTMENTS, L.P.,
                                       :
                 Plaintiffs,
                                       :
           - against -                           06 Civ. 2434 (DC)
                                       :
RESURGENCE ASSET MANAGEMENT, LLC,
JAY CAROTHERS, MARK SCOTT, COLEEN      :
COLREAVY, ROBERT WEBBER, BYRON
HANEY, and DELOITTE & TOUCHE USA       :
LLP,
                                       :
                 Defendants.
                                       :
- - - - - - - - - - - - - - - - - -x          **OPINION**

BAY HARBOUR MANAGEMENT LLC,             :

                 Plaintiff,             :

           - against -                  :        06 Civ. 2520 (DC)

JAY CAROTHERS, MARK SCOTT, COLEEN       :
COLREAVY, ROBERT WEBBER, DELOITTE
& TOUCHE USA LLP, and                   :
"JOHN DOE" "1"-"20,"
                                        :
                 Defendants.
                                        :
- - - - - - - - - - - - - - - - - -x

**APPEARANCES:**     (See last page)

**CHIN, D.J.**

        These related cases arise from a private placement of

debt securities issued by furniture retailer Levitz Home

Furnishings, Inc. ("LHFI") in November 2004.  Plaintiffs Xerion

Partners I LLC, Xerion Partners II Master Fund Limited, Cohanzick

Credit Opportunities Master Fund Ltd., Dalton Investments, LLC, and SOF Investments, L.P. (collectively "Xerion") and plaintiff Bay Harbour Management LLC ("Bay Harbour") bring these related actions for securities fraud, common law fraud, and negligent misrepresentation against defendants Jay Carothers, Mark Scott, Coleen Colreavy, and Robert Webber, all current or former corporate employees of LHFI (the "Individual Defendants"), and Deloitte & Touche USA LLP ("Deloitte"), the accounting firm that audited LHFI's financial statements.  Xerion also sues defendant Resurgence Asset Management, LLC, the majority shareholder of LHFI, and Byron Haney, a Managing Director of Resurgence and a director of LHFI (together "Resurgence").

The Individual Defendants, Deloitte, and Resurgence move to dismiss for failure to state a claim upon which relief may be granted pursuant to Federal Rule of Civil Procedure 12(b)(6) and for failure to comply with the pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA").  For the reasons set forth below, the motions are granted.

**BACKGROUND**

A.   **The Facts**

For purposes of these motions to dismiss, the facts as alleged in Xerion's amended complaint and Bay Harbour's second amended complaint are assumed to be true.

Bay Harbour and Xerion's allegations are essentially the same.  Relevant differences are discussed below.

1.   __The Parties__

Plaintiffs are sophisticated, accredited investors within the meaning of the Securities Act of 1933.  (BHAC ¶ 38; XAC ¶ 47).[1]

At the time the debt securities were placed, the Individual Defendants were employed by LHFI:  Carothers was Chairman and Chief Executive Officer; Scott was Chief Operating Officer; Colreavy was Senior Vice President of Finance (she is now Chief Financial Officer); and Webber was General Counsel and Senior Vice President.  (BHAC ¶¶ 15-18; XAC ¶¶ 14-17).  Resurgence owned 84% of LHFI's common stock and 100% of three different series of LHFI preferred stock.  (XAC ¶ 13).  Haney was a director of LHFI and a managing director of Resurgence.  (Id. ¶ 18).  Deloitte was LHFI's accounting firm prior to and at the time of the placement of the debt securities.  (Id. ¶ 19; BHAC ¶ 24).

2.   __The Offering__

In November 2004, LHFI offered $130 million in debt securities (the "Offering") in the form of "high yield" or "junk" bonds, with interest rates of 12 and 15%, pursuant to an offering circular dated October 29, 2004 (the "Circular").  (LHFI Circular 8; BHAC ¶¶ 37-38; XAC ¶¶ 42-43).  The Offering was not registered with the Securities Exchange Commission ("SEC") and was available

---

[1]     "BHAC" refers to Bay Harbour's second amended complaint.  See infra.  "XAC" refers to Xerion's amended complaint.

for purchase only by accredited investors within the meaning of the 1933 Securities Act and relevant regulations.  (LHFI Circular).

The Circular included LHFI's audited financial statements for the periods ending March 31, 2003 and 2004, and unaudited financial information for the period ending June 30, 2004.  (LHFI Circular 13; BHAC ¶¶ 111-12; XAC ¶ 46).  LHFI's financial information was certified by Deloitte as complying with the accounting principles generally accepted in the United States ("GAAP").  (LHFI Circular F-2; BHAC ¶ 113; XAC ¶ 48).  The financials also included calculations of earnings before interest, taxes, depreciation, and amortization ("EBITDA"), and "pro formas" or future projections of EBITDA, measurements that do not comply with GAAP and are not accepted by the SEC.  (LHFI Circular 13; see BHAC ¶¶ 63-64; XAC ¶ 48).

In connection with the Offering, LHFI conducted a "Road Show" for potential investors, attended by Carothers, Scott, and Colreavy.  (BHAC ¶¶ 58, 60; XAC ¶ 75).

The following statements from the Circular are relevant here.  LFHI's leasehold interests were represented as having a value of $73 million as of June 2004,[2] a representation that was repeated at the Road Show.  (BHAC ¶¶ 82-83; XAC ¶¶ 50, 52).

---

[2]     The leaseholds were not security for the Offering. (LHFI Circular 8; BHAC ¶ 88).  Rather, they were subject to a negative pledge, pursuant to which LHFI agreed not to encumber the leaseholds to the detriment of the holders of the securities. (LHFI Circular 8; BHAC ¶ 88).  Nevertheless, Bay Harbour contends in its second amended complaint that the leaseholds did "effectively act[] as security" for the Offering.  (BHAC ¶ 89).

Also, the Circular represented LHFI's goodwill as having a value
of approximately $90 million as of June 2004.  (BHAC ¶ 95; XAC
¶ 61).  In the Circular and at the Road Show, LHFI and the
Individual Defendants stated that LHFI had certain strengths,
including, <u>inter alia</u>, strong and diversified vendor
relationships and a highly experienced management team.  (LHFI
Circular 3; <u>see</u> BHAC ¶ 75; XAC ¶ 67).  Also in the Circular and
at the Road Show, LHFI stated that its EBITDA for the preceding
twelve months was $32 million audited as of June 30, 2004, and
$36 million unaudited as of September 30, 2004.  (BHAC ¶ 60; XAC
¶ 76).  Finally, the Circular reported that LHFI had a net loss
of $11 million for the quarter ending June 30, 2004.  (XAC ¶ 81;
<u>see</u> BHAC tbl. 2).

     Xerion purchased $29.4 million of the debt securities.
(XAC ¶ 113).  Bay Harbour purchased or holds the rights to $19
million.  (BHAC ¶ 9).

    **3.**    **Deloitte's Role**

     Deloitte served as LHFI's independent auditor and
audited and issued reports on LHFI's financial statements prior
to, at the time of, and in connection with the Offering.  (BHAC
¶ 24; XAC ¶ 89).

     In its report addressed to the LHFI board of directors
attached to the Circular, Deloitte stated that it had conducted
an audit of LHFI's financial information in accordance with
generally accepted auditing standards of the United States
("GAAS"), and that, in Deloitte's reasonable opinion, the

- 5 -

financial statements complied with GAAP and "presented fairly, in all material respects, the consolidated financial position of the Company at March 31, 2004 and 2003."  (LHFI Circular F-1).

    4.   **Events After the Offering**

      The sale of the debt securities closed on November 9, 2004.  LHFI reported a net loss of $10 million for the second quarter ending August 31, 2004.  (XAC ¶ 81; see BHAC tbl. 2). For the third quarter ending December 31, 2004, LHFI reported a net loss of $28 million.  (XAC ¶ 81; see BHAC tbl. 2).  On March 11, 2005, Carothers resigned as Chairman and CEO of LHFI.  (XAC ¶ 73).  Thereafter, LHFI announced a business strategy different from what had been outlined in the Circular and at the Road Show. (Id.).

      In its year-end statement for March 31, 2005, LHFI reported an annual net loss of $212 million.  (Id.).  Also on March 31, 2005, LHFI reported the value of its leasehold interests as of that date as $48 million.  (BHAC ¶ 84; XAC ¶ 55). Xerion subsequently learned that the $73 million figure cited in the Circular was calculated in 2001.  (XAC ¶ 58).  On the same day, LHFI reported that the stated value of its goodwill as of that date was zero.  (Id. ¶ 62; BHAC ¶ 99).

      In April 2005, plaintiffs were advised that LHFI was experiencing financial difficulties.  (BHAC ¶ 157; XAC ¶ 115). The price of the debt securities purchased by the plaintiffs declined from a high of $104 per share on January 21, 2005, to a low of $52 on September 30, 2005.  (XAC ¶ 120).  On October 11,

2005, LHFI filed for Chapter 11 bankruptcy protection.  (BHAC
¶ 159; XAC ¶ 121).

**B.   Plaintiff's Allegations**

    **1.   Individual Defendants and Resurgence**

        Bay Harbour contends that unknown to it at the time of
the Offering LHFI "was in a state of financial 'free fall.'"
(BHAC ¶ 2).  Xerion alleges that the Offering was the main
component of a "scheme" concocted by LHFI, Resurgence, and the
Individual Defendants to, <u>inter alia</u>, "keep LHFI viable long
enough for [Resurgence] to devise an exit strategy for itself"
(XAC ¶ 41), while Bay Harbour contends the Offering was contrived
by the Individual Defendants as part of a "desperate bid" to keep
"the house of cards that was [LHFI]" from "collaps[ing] around
them."  (BHAC ¶ 27).  Specific allegations are detailed below.

    **a.   Leasehold Value**

        Plaintiffs allege that the $73 million stated value of
the leaseholds in the Circular was a misrepresentation and an
overstatement.  (BHAC ¶ 83; XAC ¶ 54).  Plaintiffs note that the
leasehold value was revised to $48 million on March 31, 2005 as
of that date, "amid an extraordinary rise in real estate and
leasehold values generally."  (BHAC ¶¶ 84-85; XAC ¶¶ 55, 57).
Xerion pleads on information and belief that the actual value of
the leasehold interests at the time of the Circular and the
Offering in October and November 2004 was "substantially less
than even" the $48 million stated value as of March 31, 2005.

(XAC ¶ 56).  Xerion also contends that the March 31, 2005
reduction "was wholly inconsistent with what an investor would
ordinarily expect during that time period."  (Id. ¶ 57).
Additionally, Xerion notes that the leasehold value in the
Circular was a figure calculated in 2001.[3]  (Id. ¶ 58).  On these
bases, and because of their positions as insiders at LHFI,
plaintiffs conclude that in October 2004 the Individual
Defendants and Resurgence "knew or should have known . . . that
the valuation of the leaseholds as represented . . . was
materially false."  (Id. ¶ 59; see BHAC ¶ 91).

> **b.  Goodwill Value**

Plaintiffs allege that the $90 million stated value of
goodwill in the Circular was a misrepresentation.  (BHAC ¶ 95;
XAC ¶ 61).  As of March 31, 2005, LHFI reported a goodwill of
zero.  (BHAC ¶ 99; XAC ¶ 62).  Plaintiffs contend that the value
of LHFI's goodwill was zero at the time of the Circular and
Offering.  (XAC ¶ 62 ("a truthful valuation in the [Circular]
would have shown" that the goodwill had no value as of October
2004); see BHAC ¶ 100 ("The Offering Circular did not disclose
that goodwill was wildly inflated, much less that it was non-
existent or almost non-existent.")).  Because of their position

---

[3]     Much of Bay Harbour's pleadings with respect to the
leasehold write down are given over to contentions that had the
leaseholds been valued at $73 million instead of $48 million at
the time of the October 2005 bankruptcy, Bay Harbour would have
received more than "de minimis distributions approximating only
10%" of the value of its investment in the debt securities.
(BHAC ¶ 94).

as insiders at LHFI with access to confidential financial
information, plaintiffs contend that the Individual Defendants
knew or should have known the true value of LHFI's goodwill, and
are therefore responsible for what plaintiffs allege is a
material misstatement.  (XAC ¶ 62; see BHAC ¶ 101).

### c.    **Business Strategy**

Xerion contends that LHFI misrepresented its business
strategy in the Circular and at the Road Show.  (XAC ¶¶ 67-68,
71).  Following the Offering, in March 2005, Carothers left
LHFI,[4] and LHFI announced a business strategy "radically
different" from that outlined in the Circular.  (Id. ¶ 73).
Xerion alleges that both Carothers's departure and the change in
strategy were "what had been planned all along," including at the
time of the Circular and Offering.  (Id. ¶ 74).  Both plaintiffs
contend that the Individual Defendants withheld inside
information of LHFI's true financial conditions and future plans
from potential investors "so that they could accomplish their
goal of prolonging LHFI's existence."  (XAC ¶ 72; see BHAC ¶¶ 26-
29).

### d.    **EBITDA Allegations**

Plaintiffs allege that in the Circular and at the Road
Show LHFI misrepresented its financial results by understating
costs, overstating earnings, and manipulating inventory.  (XAC

---

[4]    Bay Harbour contends that Carothers left LHFI "shortly
after" closing of the Offering on November 9, 2004.  (BHAC ¶¶ 15,
152).  Carothers left LHFI in March 2005.  (XAC ¶ 73).

¶ 77; <u>see</u> BHAC ¶ 57).  On information and belief, Xerion pleads that Carothers and Colreavy, "with the knowledge and/or reckless disregard of the true facts by the other Individual Defendants and Deloitte," employed a "variety of techniques to inflate earnings" in violation of GAAP.  (XAC ¶ 78).  Specifically, Xerion contends that LHFI "accrued unauthorized, improper, and unsustainable deductions from accounts payable due to vendors, inflated earnings . . . and manipulated 'same store' sales figures."  (<u>Id.</u> ¶ 78).  Bay Harbour alleges that LHFI and Carothers in particular "manipulated inventory value" to inflate earnings by at least $3 million and possibly as much as $6 million.  (BHAC ¶¶ 57, 66-69).

In connection with the EBITDA figures, Xerion recites the quarterly net losses LHFI suffered for all quarters of fiscal year 2004, and alleges that "[t]here was no warning of [the] ongoing [financial] implosion in the [Circular]," and that "the transaction [was] touted as the final phase of a turnaround." (XAC ¶¶ 81-82).  Both plaintiffs allege that the Individual Defendants knew that "LHFI's publicly-announced pro forma EBITDA numbers were inflated."  (<u>Id.</u> ¶ 80; <u>see</u> BHAC ¶¶ 67-69).

### e.   <u>Vendors and Inventory</u>

Plaintiffs contend that at the time of the Offering LHFI's vendor relationships were not strong, contrary to what was reported in the Circular, and that "LHFI was actually on the verge of losing three of its top vendors due to delayed payments."  (XAC ¶ 69; <u>see</u> BHAC ¶¶ 75-76).  Plaintiffs further

allege that at the time of the Offering:  (1) LHFI was "unable to obtain preferential pricing and actually paid more for furniture than its competitors"; (2) "LHFI would make sales and then be unable to deliver, driving customers away and further decreasing its sales"; (3) "LHFI lacked any effective inventory management program"; (4) LHFI shut down twenty stores within a nine-month period and twenty stores had negative cash flows during the preceding year[5]; and (5) the Individual Defendants "lacked the expertise and experience to operate LHFI's stores," and "failed to disclose that LHFI lacked a modern accounting system."[6]  (XAC ¶¶ 84-87; see BHAC ¶ 138).

Bay Harbour contends that LHFI manipulated inventory and alienated vendors.  (BHAC ¶¶ 42-43, 45-46, 48-49, 70).  In furtherance of this, LHFI and Jay Carothers in particular implemented an "inventory moratorium," in furtherance of which LHFI instructed "employees involved in store closings to cease taking markdowns for old, outdated and or damaged inventory." (Id. ¶ 42).  Bay Harbour also alleges that LHFI "treat[ed] third-party warehouse inventory as if it were [LHFI]-owned inventory" in an effort to boost the inventory record.  (Id. ¶ 45). Additionally, Bill Hayes, Vice President of Internal Audit, contends that LHFI requested that vendors issue LHFI credits on

---

[5]    Xerion does not specify which stores these are, or when the nine-month period was.

[6]    In the Circular, LHFI stated that it had identified in audits for years 2003 and 2004 that it "lack[ed] formal accounting policies and procedures."  (LHFI Circular 40).

"perfectly good inventory" in an aggregate of $3 million, and then improperly booked these amounts as advertising expense reimbursements.  (Id. ¶ 55).  Hayes states that when he raised these issues with Colreavy, she dismissed his concerns about this practice and requested he not inform her of these practices in the future because she would have to take such concerns to the board of directors.  (Id. ¶¶ 56-57).

## 2.  **Deloitte**

With respect to defendant Deloitte, plaintiffs allege that it "fail[ed] to conduct a prior audit of LHFI's financial statements and instead, simply accepted valuations provided by the Individual Defendants."  (BHAC ¶ 120; XAC ¶ 63).  Plaintiffs charge that Deloitte knew LHFI's "true financial condition, including the overstatement of goodwill and the value of the leaseholds," or recklessly disregarded their true value, and certified LHFI's financial statements despite their being "false and misleading."  (XAC ¶ 64; see BHAC ¶ 125).  Plaintiffs contend that without Deloitte's participation, "[d]efendants' scheme could not have been perpetrated."  (XAC ¶ 64; see BHAC ¶ 124).  Plaintiffs also allege that Deloitte failed to issue a "going concern" warning in its audit of LHFI's financial statements "despite knowledge of material adverse facts about the financial and business condition of LHFI that made the survival of LHFI as a going concern highly unlikely, if not impossible."  (XAC ¶ 74; see BHAC ¶¶ 130-31).

Plaintiffs further complain that Deloitte violated GAAS in issuing an unqualified opinion on LHFI's financial statements. (BHAC ¶¶ 128, 132; XAC ¶ 93).  Plaintiffs contend that Deloitte violated:  (1) General Standard number 3, requiring due professional care in auditing and preparing a report; (2) Standard of Field Work number 3, requiring that sufficient competent evidential matter be gained; and (3) Standard of Reporting number 3, requiring that informative disclosures in the financial statements be regarded as reasonably adequate unless otherwise stated.  (BHAC ¶ 132; XAC ¶ 94).  Plaintiffs also allege that LHFI did not comply with GAAP, a fact that Deloitte was required to report.  (BHAC ¶ 133; XAC ¶ 95).  Specifically, plaintiffs contend that Deloitte learned and ignored, or recklessly failed to learn, inter alia, that:  (1) The leaseholds were overvalued; (2) the goodwill was overstated; (3) LHFI was having vendor disputes; (4) LHFI's sales and interests were declining and its cost-cutting measures were not improving the business; (5) deductions from amounts owed vendors were not properly accounted for; and (6) inventory losses were not being recognized.  (BHAC ¶ 138; XAC ¶ 99).

Bay Harbour alleges that Deloitte knew about the inventory manipulations complained of by Hayes, yet failed to investigate.  (BHAC ¶¶ 54, 106, 123).  Hayes further claims that Deloitte informed LHFI management that "it did not feel comfortable continuing the audit engagement during the next year."  (Id. ¶¶ 54, 108).

- 13 -

C.   **Procedural History**

Xerion filed its original complaint on March 28, 2006.
On March 30, 2006, Bay Harbour filed its original complaint.

After a conference on May 19, 2006, the Court granted
all plaintiffs leave to file any amended complaints by June 9,
2006, set a schedule for defendants to file their motions to
dismiss following the filing of any amended complaints, and
stayed all discovery pending the outcome of the motions.
(5/19/2006 Order).  On June 9, 2006, Bay Harbour filed its
amended complaint.  On June 13, 2006, Xerion filed its amended
complaint, which was accepted by the Court even though it was
late.

On July 10, 2006, the Individual Defendants,
Resurgence, and Deloitte filed motions to dismiss both amended
complaints.  On August 10, 2006, plaintiffs filed their
oppositions, and on August 25, 2006, defendants filed their
replies.  On November 16, 2006, Bay Harbour notified the Court
that it wished to file a second amended complaint.  Defendants
objected, and, after briefing of a motion to amend, I denied in
part and granted in part leave to amend for a second time on
February 1, 2007.  See Bay Harbour Mgmt. LLC v. Jay Carothers,
--- F. Supp. 2d ---, 2007 WL 274197 (S.D.N.Y. 2007).  Bay Harbour
was permitted to amend its complaint to correct typographical
errors and to attribute certain allegations to Hayes.  Id. at *1.
Bay Harbour served its second amended complaint on February 12,
2007.

- 14 -

Plaintiffs allege that the Individual Defendants knew or should have known about the material misstatements and misrepresentations plaintiffs allege were contained in the Circular and made at the Road Show by virtue of the Individual Defendants' positions as insiders at LHFI with access to financial reports and other confidential information.  (BHAC ¶¶ 21, 23; XAC ¶¶ 59-60).  Bay Harbour contends that the Individual Defendants were motivated by their desire to "continue receiving the high levels of compensation they were receiving." (BHAC ¶ 29).  On information and belief, it also maintains that the Individual Defendants acted "to forestall [LHFI's] impending demise . . in a desperate bid to prevent their careers and reputations from being destroyed at all costs . . . exposing their mismanagement and misconduct for all to see."  (BHAC ¶ 27).  Finally, Bay Harbour points to Carothers's resignation as CEO of LHFI in March 2005 -- "shortly after the debt offering closed" -- as circumstantial evidence of Carothers's knowledge of his own wrongdoing.  (BHAC ¶ 152).

Xerion and Bay Harbour allege that Deloitte, by virtue of its role as LHFI's auditor generally and for purposes of the Circular and Offering, knew or should have known about the material misstatements.  (BHAC ¶¶ 25, 110; XAC ¶¶ 53, 63).  Bay Harbour also maintains that Deloitte certified LHFI's financial statements because it wished to obtain its fee.  (BHAC ¶¶ 24, 35, 119)

Xerion and Bay Harbour allege securities fraud, common law fraud, and negligent misrepresentation, and claim that Deloitte committed professional negligence.  The fraud and negligent misrepresentation claims are premised on the fraudulent nature of statements made by LHFI in the Circular and at the Road Show.  For the reasons set forth below I conclude that plaintiffs have failed to plead fraud with the requisite particularity.  The professional negligence claim asserted against Deloitte also fails as a matter of law.  Accordingly, all claims are dismissed.

### DISCUSSION

**A.   Applicable Law**

**1.   Standard on a Motion to Dismiss**

A complaint may not be dismissed under Fed. R. Civ. P. 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Chance v. Armstrong, 143 F.3d 698, 701 (2d Cir. 1998) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).  The test for dismissal is not whether the plaintiff is likely to prevail, but whether he is entitled to offer evidence to support his claims.  Id.  "In considering a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." Kramer v. Time Warner, Inc., 937 F.2d 767, 773 (2d Cir. 1991).  The court must accept the factual

allegations of the complaint as true and draw all reasonable inferences in favor of the plaintiff, Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996), but "bald contentions, unsupported characterizations, and legal conclusions are not well-pleaded allegations, and will not suffice to defeat a motion to dismiss." Gavish v. Revlon, Inc., No. 00 Civ. 7291 (SHS), 2004 WL 2210269, at *10 (S.D.N.Y. Sept. 30, 2004) (quoting Citibank, N.A., v. Itochu Int'l Inc., No. 01 Civ. 6007 (GBD), 2003 WL 1797847, at *1 (S.D.N.Y. Apr. 4, 2003)).

### 2.   Pleading Requirements for Securities Fraud Claims

To state a cause of action under § 10(b) and Rule 10b-5, plaintiff must allege that defendants:  (1) in connection with a purchase or sale of securities; (2) with scienter; (3) made a material false representation or omitted to disclose material information; (4) upon which plaintiff relied; (5) proximately causing plaintiff to suffer injury.  Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005); see also Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005). Securities fraud allegations under § 10(b) and Rule 10b-5 are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4(b).

Rule 9(b) requires that, whenever a complaint contains allegations of fraud, "the circumstances constituting fraud . . . shall be stated with particularity."  See Fed. R. Civ. P. 9(b); see also Chill v. Gen. Elec. Co., 101 F.3d 263, 267 (2d Cir.

1996) (noting that "the actual fraudulent statements or conduct and the fraud alleged must be stated with particularity") (internal citations omitted).  "[A] complaint making such allegations must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'"  Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994) (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)).  "In short, a plaintiff must 'set forth the who, what, when, where and how of the alleged fraud.'"  United States ex rel. Sarafoglou v. Weill Med. Coll. of Cornell Univ., 451 F. Supp. 2d 613, 623 (S.D.N.Y. 2006) (quoting United States ex rel. Thompson v. Columbia/HCA Healthcare Corp., 125 F.3d 899, 903 (5th Cir. 1997)).

The PSLRA requires plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  While the PSLRA does not require plaintiffs to plead "every single fact upon which their beliefs concerning false or misleading statements are based," it does require the facts alleged to be "sufficient to support a reasonable belief as to the misleading nature of the statement or omission."  Shields, 25 F.3d at 1128.

"Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000). An "unsupported general claim of the existence of confidential company sales reports that revealed [unfavorable figures] is insufficient to survive a motion to dismiss." San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 812 (2d Cir. 1996). Rather, to survive a motion to dismiss, plaintiff "needs to specify the internal reports, who prepared them and when, how firm the numbers were or which company officers reviewed them." In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 72 (2d Cir. 2001). Additionally, the Second Circuit does not recognize "fraud by hindsight." Shields, 25 F.3d at 1129. "Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." Stevelman v. Alias Research, Inc., 174 F.3d 79, 84 (2d Cir. 1999) (quoting Acito v. IMCERA Group, Inc., 47 F.3d 47, 53 (2d Cir. 1995)); see also Novak, 216 F.3d at 309.

To satisfy the Rule 9(b) and PSLRA pleading requirements with respect to scienter, plaintiffs must allege facts giving rise to a strong inference of fraudulent intent. Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001); see Goplen v. 51job, Inc., 453 F. Supp. 2d 759, 770-71 (S.D.N.Y. 2006). The requisite intent may be established either by alleging facts (1) showing that defendants had both motive and opportunity to commit

- 19 -

fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness.  <u>Acito</u>, 47 F.3d at 52. With respect to motive, "[g]eneral allegations that the defendants acted in their economic self-interest are not enough," <u>Ganino v. Citizens Utils. Co.</u>, 228 F.3d 154, 170 (2d Cir. 2000), and "[m]otives that are generally possessed by most corporate directors and officers do not suffice."  <u>Kalnit</u>, 264 F.3d at 139. As to circumstantial evidence of conscious misbehavior or recklessness, these have been defined by the Second Circuit as "deliberate illegal behavior," and "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care," respectively.  <u>Novak</u>, 216 F.3d at 308 (quotations omitted).

### 3.   <u>Professional Negligence</u>

Before accountants may be held liable for professional negligence to noncontractual parties who rely to their detriment on inaccurate financial reports, certain prerequisites must be satisfied:  (1) The accountants must have been aware that the financial reports were to be used to a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountant's understanding of that party or parties' reliance.  <u>Ahmed v. Trupin</u>, 809 F. Supp. 1100, 1105 (S.D.N.Y. 1993); <u>see</u> <u>Sec. Investor Prot. Corp. v. BDO Seidman, LLP</u>, 222 F.3d 63, 73-74 (2d Cir. 2000).  Although "[a]n

unidentified buyer may still be a known party," third parties alleging professional negligence against an accounting firm must still demonstrate a "nexus" between themselves and the accounting firm invit[ing] reliance beyond the mere fact that accounting figures, once written down, may be read by anyone." Ahmed, 809 F. Supp. at 1105.

## B.   **Application**

Plaintiffs allege that false and misleading statements were made by the Individual Defendants, Resurgence, and Deloitte in connection with the Offering and Circular in the following five areas:  (1) the leasehold value; (2) the goodwill value; (3) LHFI's future business plans; (4) the EBITDA value; and (5) LHFI's vendor relationship and inventory management.  For the reasons that follow, I conclude that plaintiffs have failed to adequately plead securities fraud.

### 1.   **Leasehold Value, Goodwill, and Business Strategy**

Plaintiffs have failed to plead with particularity sufficient facts to show why any of the statements made in connection with the leasehold value, goodwill value, or business strategy were false when made.  See Shields, 25 F.3d at 1128.

In their pleadings plaintiffs note that these all changed five months after the Offering -- the leaseholds and goodwill were devalued, Carothers left LHFI, and the business strategy altered course.  Based on these changes that occurred five months after the closing on the debt securities and which were not retroactive, plaintiffs conclude that statements about

- 21 -

them in the Circular and at the Road Show must have been false when made.  The Second Circuit, however, does not recognize "fraud by hindsight" pleading.  See id. at 1129; see also Novak, 216 F.3d at 309; Stevelman, 174 F.3d at 84.

Furthermore, plaintiffs present no facts, other than Resurgence and the Individual Defendants' positions as insiders with access to confidential business information, to support their allegation that Resurgence or the Individual Defendants knew and concealed the "true" state of LHFI's leasehold or goodwill value, or LHFI's future business plans.  See Novak, 216 F.3d at 309; San Leandro Emergency Med. Group Profit Sharing Plan, 75 F.3d at 812; see also In re Scholastic Corp. Sec. Litig., 252 F.3d at 72.  Plaintiffs fail to identify a single specific report that indicated the leaseholds or goodwill were improperly valued at the time of the Circular or the Road Show, or that indicated that the business strategy as presented in the Circular and at the Road Show was contemporaneously false.  See In re Scholastic Corp. Sec. Litig., 252 F.3d at 72.

Plaintiffs' conclusory allegations do not suffice to state a claim for fraud under Rule 9(b) or the PSRLA.  The claims of misrepresentation with respect to the leasehold value, goodwill, and business strategy must be dismissed for failure to state a claim on which relief can be granted.

## 2.   **EBITDA**

Plaintiffs allege that LHFI's EBITDA and pro forma EBITDA were misstated.  (XAC ¶¶ 77, 80; see BHAC ¶¶ 67-69).  Bay

Harbour further pleads that LFHI's EBITDA was inflated in part because of the allegedly improper "inventory moratorium." (BHAC ¶¶ 68-69).

### a.   __Xerion__

Xerion has not met its burden of pleading sufficient facts "to support a reasonable belief as to the misleading nature of the statement." Shields, 25 F.3d at 1128. Xerion has not alleged a single fact to support its claim that the EBITDA number was inflated -- instead, it has simply concluded that it was. Additionally, even if Xerion had alleged a reason that the EBITDA figure was inflated, as discussed above, general allegations that insiders had access to confidential information are insufficient. See Novak, 216 F.3d at 309; San Leandro Emergency Med. Group Profit Sharing Plan, 75 F.3d at 812; see also In re Scholastic Corp. Sec. Litig., 252 F.3d at 72. Yet generalized allegations based on access to confidential information is all Xerion has pled with respect to EBIDTA. (See XAC ¶ 80).

Xerion also seems to imply some impropriety in LHFI's reporting of a positive EBITDA while having a net loss. (XAC ¶¶ 81-82). There is nothing inherently improper, however, about reporting a positive EBITDA while simultaneously reporting a net loss. The two are entirely different measures, and indeed, EBITDA is not recognized as complying with GAAP -- as was stated in the Circular. (LHFI Circular 13-15). If inclusion of the net losses was an attempt to plead that LHFI had misstated its EBITDA numbers, it has failed. Xerion has not adequately pled that the

statements made about EBITDA were materially false when made. Accordingly, Xerion's claims premised on EBITDA must be dismissed.

### b.  Bay Harbour

Bay Harbour alleges that the EBITDA figures were inflated in part because of the improper "inventory moratorium" implemented by Carothers.  (BHAC ¶¶ 67, 69).  For purposes of this motion, I assume the allegation about the inventory moratorium to be true.  As discussed below, however, Bay Harbour has failed to adequately plead scienter with respect to misstatements about LHFI's inventory.  Because this is Bay Harbour's only particularized allegation of a material misstatement with respect to LHFI's EBITDA figures, Bay Harbour's EBITDA claim fails, and must be dismissed.

### 3.  Vendor Relationships and Inventory Management

### a.  Xerion

As to LHFI's business strengths, Xerion recites several allegations made on information and belief purporting to indicate that LHFI's business was not as strong as was reported in the Circular and touted at the Road Show.  (See XAC ¶¶ 84-87). Xerion has failed to plead a single fact supporting any of these allegations.  See Shields, 25 F.3d at 1128.  Therefore Xerion's claims alleging that LHFI made material misstatements about its business strengths must be dismissed.

- 24 -

### b.   **Bay Harbour**

For purposes of this motion, I assume that Bay Harbour has alleged sufficient facts to support its claims of inventory manipulation and vendor alienation, resulting in materially misleading statements in the Circular, including the EBITDA figures.  Bay Harbour has failed, however, to adequately plead scienter in connection with these statements.  The Second Circuit has recognized that general allegations of economic self-interest and other motives possessed by any corporate officer or director are insufficient to plead scienter for securities fraud.  Kalnit, 264 F.3d at 139; Ganino, 228 F.3d at 170.  Wishing to retain employment and stock options can only be described as such motives.  (See BHAC ¶¶ 29-33).  Bay Harbour also alleges that the Individual Defendants wished to conceal prior illegal activity.  (BHAC ¶ 27).  These allegations are pled on information and belief only, without any particularized facts, and thus fail to state a claim for securities fraud.  See 15 U.S.C. § 78u-4(b)(1); Shields, 25 F.3d at 1128.

Finally, with respect to the purported scienter of the Individual Defendants, Bay Harbour contends that Carothers's knowledge of wrongdoing is demonstrated by his resignation, which came four months after the closing on the debt securities.  (BHAC ¶ 152).  This circumstance falls far short of "deliberate illegal behavior," or "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care."  Novak, 216 F.3d at 308 (quotations omitted).

Bay Harbour has failed to adequately plead scienter here, and thus these claims must be dismissed. In addition, I note that both Bay Harbour and Xerion have failed to adequately plead scienter regarding any of the securities fraud claims, alleging merely that the Individual Defendants wished to retain their jobs and compensation and that Resurgence wished to keep LHFI from failing, or, in the case of Bay Harbour, alleging without articulating any facts that the Individual Defendants wished to conceal prior wrongdoing. This failure to properly plead scienter provides an independent basis for dismissing plaintiffs' fraud claims. See Kalnit 264 F.3d at 139; Ganino, 228 F.3d at 170.

### 5.   **Deloitte**

Plaintiffs' claims for securities fraud and common law fraud also must be dismissed as against Deloitte, because plaintiffs have failed to adequately plead fraud with particularity as discussed above. Additionally, plaintiffs's claims of professional negligence against Deloitte fail as a matter of law. See Ahmed, 809 F. Supp. at 1105. Deloitte and plaintiffs were not in privity of contract, and plaintiffs took no action to put Deloitte on notice that they were relying on Deloitte's audit "beyond the mere fact that accounting figures, once written down, may be read by anyone." Id.

Accordingly, all claims against Deloitte are dismissed.

### CONCLUSION

In closing, I observe that both Bay Harbour and Xerion were absolutely on notice of the riskiness of their investment in

LHFI.  The Circular not only warns generally of the risks of
investing in debt securities, but also specifically warns, as
part of a fifteen-page section on the risks of the investment,
that LHFI's "substantial level of indebtedness could adversely
affect [LHFI's] financial condition and prevent [LHFI] from
fulfilling [its] obligations" with respect to the debt
securities.  (LHFI Circular 16).  Indeed this is the first
warning in the risk factor section, and is printed in both bold
and italic font -- it cannot be missed.  (Id.).  The Circular
also clearly states that the proceeds from the Offering would be
used entirely to pay down existing debt.  (Id. at 31).  Indeed,
Xerion's own pleadings indicate that it was aware of LHFI's less
than robust financial condition:  Xerion's amended complaint
recounts LHFI's financial difficulties dating back to 1996 and
lasting through 2004.  (XAC ¶¶ 23-40).  Furthermore, the high
interest rates of the debt securities themselves put plaintiffs
on notice of the risky nature of investing in LHFI.

          For the foregoing reasons, defendants' motions to
dismiss are granted.  The Clerk of the Court shall enter judgment
dismissing these cases, with prejudice, and with costs but
without fees.

          SO ORDERED.

Dated:    New York, New York
          February 22, 2007

                                        DENNY CHIN
                                        United States District Judge

- 27 -

**<u>APPEARANCES</u>:**

For Xerion Partner I, L.L.C., Xerion Partners II Master Fund
Limited, Cohanzick Credit Opportunities Master Fund, Ltd., Dalton
Investments, L.L.C., SOF Investments, L.P.:

    ARNOLD & ITKIN, LLP
        By:  Jason Aaron Itkin, Esq.
           Camilo Cardozo, Esq.
    700 Louisiana Street, Suite 4700
    Houston, TX  77002

    DREIER LLP
        By:  Marc S. Deier, Esq.
           Jeffrey A. Mitchell, Esq.
    499 Park Avenue
    New York, NY  10022

For Bay Harbour Management LLC:

    J.L. SAFFER, P.C.
        By:  Jennifer Lauren Saffer, Esq.
           Scott A. Lucas, Esq.
    20 Vessey Street, 7th Floor
    New York, NY  10007

For Resurgence Asset Management, L.L.C.:

    WEIL, GOTSHAL & MANGES LLP (NYC)
        By:  Joseph S. Allerhand, Esq.
           John A. Neuwirth, Esq.
           Bradley R. Aronstam, Esq.
           Michele C. Lamberti, Esq.
    767 Fifth Avenue
    New York, NY  10153

For Jay Carothers, Mark Scott, Coleen Colreavy, and Bruce Webber:

    CRAVATH, SWAINE & MOORE LLP
        By:  Robert H. Baron, Esq.
           Jeffrey B. Korn, Esq.
    825 Eighth Avenue
    New York, NY  10019

For Deloitte & Touche USA LLP:

    HUGHES HUBBARD & REED LLP
        By:  William R. Maguire, Esq.
           Sarah Loomis Cave, Esq.
    One Battery Park Plaza
    New York, NY  10004